### WOOD v. BRIGHTON MILLS.

### SAME v. JENCKES SPINNING CO.

(Circuit Court of Appeals, Third Circuit. February 13, 1924.)

Nos. 3066, 3092.

1. Sales ⊜=89—Correspondence held to show substitution of new contract with regard to deliveries.

Correspondence between manufacturer and buyer of fabric *held* to show substitution of a new contract under which manufacturer was to defer deliveries and buyer was to pay carrying charges for failure to take the goods on the original delivery dates.

2. Contracts ⊜=237(1)—Difference between substituted contract and rescission of terms of contract and "waiver" stated.

The difference between a substituted contract and a rescission of the terms of a contract covering the same subject-matter and a waiver of some one or more such terms is that the substituted contract must be supported by consideration and, by reason of the fact that it covers the same subject-matter, renders void all the correlative rights and liabilities of the parties to the original instrument, while a waiver is a mere relinquishment of such rights as are expressly waived.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Waiver.]

⊜=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Sales ⬤⟹94—Buyer cannot claim damages for breach of original contract where new contract made.**

Where buyer and seller of goods made a new contract, providing for deferred deliveries, and payment by buyer of compensation for failure to accept the goods on the original delivery dates, the buyer cannot claim damages for seller's breach of the original contract.

4. **Frauds, statute of ⬤⟹131(1)—Acts held to take out of statute verbal modification of contract for purchase of goods.**

Where buyer accepts goods under a modified contract deferring delivery, pays the carrying charges, and pays for the goods so accepted, *held,* that any one of these acts is a sufficient execution to make the contract as modified by a verbal agreement good within the statute.

5. **Sales ⬤⟹176(1)—Buyer's right to damages for delay held waived.**

There was an express waiver of any right to damages on buyer's part for seller's antecedent delay in delivery, where the buyer requested further delay, and, to obtain it, gave notes and paid carrying charges.

6. **Sales ⬤⟹384(6)—Difference between price and market value held measure of damages for goods already manufactured.**

As to fabrics which manufacturer had made and not delivered because buyer, subsequently going into receivership, had requested it not to, manufacturer is entitled to the difference between the contract price and the market price at the time of the breach.

7. **Sales ⬤⟹384(6)—Damages for breach of contract for sale of goods not yet manufactured.**

Under New Jersey Uniform Sales of Goods Act, § 64, subd. 4, where manufacturer had not manufactured fabric contracted for at the time of buyer's breach of contract, but it had large quantities of raw material and was in a position to perform when requested, manufacturer is entitled to the profit it would have obtained had it performed, plus the difference between the cost of the raw materials and their market value at the date of the breach, but cannot manufacture the goods and then secure the market value as a basis for determination of its loss.

8. **Receivers ⬤⟹90—Refusal of receivers to carry on contract held breach.**

Where receivers were appointed for corporate buyer before deliveries were completed, their refusal to carry on the contracts amounted to a breach of contract entitling the seller to damages.

9. **Sales ⬤⟹89—Result of buyer's request to delay deliveries and agreement to pay incidental charges stated.**

The action of buyer in requesting delays of deliveries and agreeing to pay the charges incident to deferred deliveries amounted either to a new contract, the terms of which were substituted for the original contract when adequately supported by consideration and outside of the statute of frauds, or to a waiver by buyer of its right under the original contract to delivery of specific amounts on specific dates.

10. **Sales ⬤⟹384(6)—Damages for breach of contract for goods to be manufactured stated.**

Under New Jersey Uniform Sales of Goods Act, § 64, subd. 4, damages for buyer's breach of contract to purchase goods to be manufactured is the difference between the contract price and the amount it would cost to manufacture and deliver plus the difference between the cost and the market value of the materials for the manufacture of the article purchased at the time of the breach, if such market value be less than cost.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit in equity by the Big Bend Coal Mining Company against the Empire Tire & Rubber Corporation. From separate judgments in the matter of the claims of the Jenckes Spinning Company and of the

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Brighton Mills, Arthur H. Wood, receiver for the defendant, appeals. Judgments affirmed.

The opinion of Bodine, District Judge, in the court below, as to the claim of Jenckes Spinning Company, was as follows:

The claim of the Jenckes Spinning Company (called spinning company) is made up of the following particulars: (1) Five promissory notes aggregating the sum of $107,652; (2) damages for the breach of seven contracts of sale amounting to $145,852; (3) an open account for carrying charges in the sum of $5,559.45.

The receivers counterclaimed for damages in the sum of $82,333.70, for the failure of the spinning company to, deliver goods at the time specified.

The master allowed the note claim and damages for the failure to take the goods contracted for and the open account for carrying charges. He also allowed the receivers damages upon their counterclaim predicated upon delays in the deliveries of the goods upon which the spinning company was allowed damages for failure of the buyers to take.

[1] Seven contracts were made by the spinning company with the Empire Tire & Rubber Corporation (called Empire). The first five were upon the form following:

"Jenckes Spinning Co.

"Pawtucket, R. I., May

"Attached hereto is memorandum of sale and confirmation of your order of     If correct please sign memorandum of purchase and return to us.

"Memorandum of Sale.

"Our order     Your order No.
Style                Width                         Oz. per Sq. Yd.
Quantity        Sq. Yds. Lbs. Rolls          Length Rolls
Price                per Sq. Yd. Lb.                  Terms:
"Deliveries:
"Shipping Directions:
"Remarks:

"Conditions.

"The fulfillment of this contract shall not be abridged or invalidated in case the production of the Jenckes Spinning Company be curtailed because of strikes, lockouts, labor troubles, war blockade, or any other unavoidable casualty. In event of the curtailment of the Jenckes Spinning Company's production, deliveries on this contract may be postponed and shall only be made proportionate to the production.

"Unless advised in writing within seven days, we will consider the price, terms, and conditions hereof are accepted by you."

The sixth and seventh contracts were upon a slightly different form, of which the following is a copy:

"Contract of sale from Jenckes Spinning Company, Pawtucket, R. I.

"Dear Sirs: We have entered your order as follows:
"Our Order Number                                Your Order Number
                    sq. yards
Quantity:          pounds
                    rolls
Our Style                         Width                    Length of Rolls
Price:
Terms:
Deliveries:                              Payable in New York or Boston funds
Delivery f. o. b. Pawtucket, R. I.
Shipping Directions:
Conditions as stated below

                                        "Jenckes Spinning Company, by
"Accepted."

The acceptance by the Empire upon each contract was evidenced in the following manner:

"Jenckes Spinning Co.
"Memorandum of Purchase.

"We accept price, terms, and conditions as contained in your order no. of 1919. Empire Tire & Rubber Corp.,
"Secy."

The tabulation below shows the essential particulars of each contract, and the actual deliveries:

Contract 6397 for style 196 carded Peeler building fabric, 300,000 pounds in rolls of 150 yards, deliveries 40,000 pounds a month January through July:

Actual deliveries—January 24,980¾
February 18,840
March 13,690
April 39,364
May 58,953¾
June 42,563¾
July 25,321

Contract No. 6849 for style 189 combed Egyptian cord fabric, 99,550 pounds in rolls of 175 yards, to be delivered in equal monthly quantities January through June, 1920:

Actual deliveries—November, 1919 750½
December, 1919 16,781
January, 1920 10,333¾
March, 1920 5,693
May, 1920 3,780¾
June, 1920 2,326½
July, 1920 13,869

Contract No. 6850 for style 189 combed Egyptian cord fabric, 100,000 pounds in rolls of 175 yards, to be delivered in equal monthly quantities January through June, 1920:

Actual deliveries—February, 1920 6,345½
March, 1920 33,795
April, 1920 7,821¼
May, 1920 2,572½
July, 1920 3,725
August, 1920 5,027
September, 1920 4,933

Contract No. 6938 for style 240 Karded Sakellarides chafing fabric, 25,000 pounds in rolls of 150 yards, to be delivered express 5 rolls at once, balance 5 rolls weekly:

Actual deliveries—December, 1919 5 rolls
January, 1920 29 rolls
February, 1920 9 rolls
March, 1920 14 rolls
May, 1920 6 rolls
June, 1920 7 rolls
July, 1920 8 rolls
January, 1921 6 rolls
February, 1921 3 rolls
March, 1921 2 rolls

Contract No. 8080 for style 221 Karded Peeler cord fabric, 80,000 pounds in rolls of 175 yards, to be delivered 20,000 pounds monthly September, October, November, December:

Actual deliveries—September, 1920 4,772¾
October, 1920 24,951½
January, 1921 11,317½

Contract 8182 was for 58,743 pounds style 299, in rolls of 175 yards, deliveries 12 rolls per week until completion of order #8080, style 221–56, then at the rate of 24 rolls per week:

Actual deliveries—January,  1921   56 rolls
                  February, 1921   36 rolls
                  March,    1921   36 rolls

Contract No. 8184 was for 28,958 pounds, style 221, in rolls of 175 yards, deliveries 35 rolls weekly, in conjunction with contract #8080, after completion of contract #8182.

The correspondence during the spring of 1920, as well as the above table, indicates that the spinning company failed in making deliveries in accordance with the terms of its contracts. It continued making partial deliveries, and the Empire merely urged better performance. In the summer of 1920, the Empire began asking for delays in deliveries. On October 5, 1920, it requested that all further shipments be withheld until after November 1st. The following correspondence shows the intention of the parties, and upon it their rights depend (the italics are mine):

"October 6th, 1920.

"Empire Tire & Rubber Corporation, Trenton, N. J.—Gentlemen: Attention—Mr. H. R. Nason. We beg to acknowledge receipt of your letter of October 5th, in which you request us to hold up further shipments of 15.1 ounce cord fabric until after November 1st, due to the fact that you have sufficient material on hand to take care of your requirements past that date.

"We certainly realize the condition of all tire companies at the present time, and your request is not an unusual one. We are, and always have been, willing to go half way and sometimes more than half way in co-operating with our customers. But we regret, in this instance, that we cannot accede to your request, inasmuch as we are carrying a burden of many holdups at the present time, in addition to those which rightfully belong to us.

"Considering the fact that these shipments on this cord fabric are made on terms of 2% 10th prox. or a 60-day trade acceptance, *we trust that you will allow us to continue shipments at the usual rate, and we assure you we will try to keep our shipments down to a minimum and if we can curtail at all, we shall certainly be glad to do so.*

"Yours very truly,                    Jenckes Spinning Company."

"10/7/20

"Jenckes Spinning Co., Pawtucket, R. I.—Gentlemen: We wrote you some days since to *withhold further shipments of tire fabric until after November 1st.* For this reason, we were very much surprised to receive another invoice from you today for #221 fabric, shipped us on the 5th.

"Will you please acknowledge receipt of this letter, *advising that you will comply with our request, as it is impossible for us to handle any more fabric this month.*

"We, therefore, trust that you will not make further shipments until advised.

"Very truly yours,                    Empire Tire & Rubber Corp.,
                                       "H. R. Nason.

"P. S. Can you date bill just received 11/1/20 as we are anxious to cut down stock for inventory.                    H. R. N."

"October 12th, 1920.

"Empire Tire & Rubber Company, Trenton, N. J.—Gentlemen: *With reference to your various contracts for fabric with us, upon which we have deferred deliveries at your request.*

"*We will appreciate it very much if you will watch your fabric requirements very closely, so that you may give us ample notice when you wish us to resume deliveries to you.*

"*At the present writing we should be receiving notification from you as to the amounts of fabric you will require under these contracts in November and December.*

"You will no doubt appreciate our position in this matter.

"Yours very truly,                    Jenckes Spinning Company."

"10/14/20.

"Jenckes Spinning Co., Pawtucket, R. I.—Gentlemen: Attention of Mr. L. P. Gervais. Answering your valued favor of the 12th *with reference to deliveries of fabric, would* state that unless it is absolutely necessary, *we would much prefer not specifying deliveries at the moment, as we are not in a position to estimate our requirements,* due to the abnormal conditions.

"We will, however, keep in close touch with the situation on this material and advise you just as soon as possible.

"Very truly yours, Empire Tire & Rubber Corp.,
"H. R. Nason, Sec'y."

"10/25/20.

"Jenckes Spinning Co., Pawtucket, R. I.—Gentlemen: *We requested you some few days since to withhold making further shipments of fabric,* which we fully believed we would be able to have resumed in November. This we find we are not able to do.

"*In view of the fact that we are not in a position to use the fabric and cannot carry any more, we ask that you discontinue shipments until advised by us to resume, which we assure you we will do as soon as possible.*

"Sincerely trusting that you will co-operate with us in this matter, acknowledging receipt of this letter and oblige

"Very truly yours, Empire Tire & Rubber Corp.,
"H. R. Nason, Sec'y."

"October 26, 1920.

"Jenckes Spinning Company, Pawtucket, R. I.—Gentlemen: Attention— Mr. I. B. Merriman. Our letter of October 22 and yours of the same date crossed in the mail.

"After receipt of Mr. Babcock's letter, dated October 13th, Mr. Nason talked with Mr. Babcock and he agreed to hold up deliveries until further instructions from us and this conversation was confirmed in writing. Our acceptance of shipments is not at all a question of willingness. We surely are willing to take it in but as we have absolutely no orders, whatever, in which to use it, there is no way for us to have any money coming in to pay the acceptances when due in sixty days, and we don't want to find ourselves in the place where we will have commitments coming due and not be able to meet them. So far we have made every payment at maturity and will continue to do so, provided we can continue to receive the same amount of co-operation as we did several months ago. You agreed then to carry us to the extent of about $66,000. We understood that you would carry us for the $66,000 and that those sixty-day acceptances would exceed that amount, but the open account is now down to about $30,000.

"*We are not endeavoring at all to dodge our obligations, but under the circumstances we are forced to ask you to hold up the shipments.* We realize that it would be hard for you to discount acceptances running longer than ninety days, and in order to arrange our commitments so that we can pay them all at maturity, and so that we can let you have the use of the money in the meantime, we are inclosing herewith our six months' note for the round sum of $25,000, with check for interest at 8%. If it costs you any more than this to discount this note, we would be glad to pay it.

"Trusting that you will understand our position and that we will receive your further co-operation, we are, with best regards from the writer.

"Yours very sincerely, Empire Tire and Rubber Corporation,
"C. Edward Murray, Jr., Treasurer."

It is the contention of the spinning company that the above correspondence marks the making of a new contract between the parties, whereby the delivery of fabric still due under the first five contracts was deferred, and for which postponement the rubber company agreed to pay, at the rate of 8% per annum on the fabric undelivered.

Upon the appointment of receivers for the defendant company on March 23, 1921, there was a definite refusal to go on with the contracts.

Such were the transactions between the parties, the master in allowing the receivers damages for delays in deliveries completely overlooks the agreement of the parties as above evidenced for a new contract in substitution of

the old. The Empire agreed to and did pay money for its failure to take the merchandise as contracted for. It had an undisputed right to stand on its contracts and insist upon the shipments thereunder. It failed to do this and by reason thereof entered into a new contract for deferred deliveries, and paid and agreed to pay for such delayed delivery at the rate of 8% per annum on the amounts due.

[2] The difference between a substituted contract, or a rescinding of the terms of a contract covering the same subject-matter and a waiver of some one or more of such terms, is that the substituted contract must be supported by consideration, and by reason of the fact that it is a contract covering the same subject-matter renders void all the correlative rights and liabilities of the parties to the original instrument, while a waiver is a mere relinquishment of such rights as are expressly waived. Williston on Contracts, 680; Bailey v. Elm City, Lumber Co., 167 App. Div. 42, 154 N. Y. Supp. 281; United States ex rel. International Contracting Co. v. Lamont, 155 U. S. 303, 15 Sup. Ct. 97, 39 L. Ed. 160; McCabe Construction Co. v. Utah Construction Co. (D. C.) 199 Fed. 976.

In Bailey v. Elm City Co., 167 App. Div. 42, 154 N. Y. Supp. 281, there was a contract for the delivery of lumber. A portion of the contract was canceled and the time of delivery as to the remainder was changed. The court held. "The subject of the contract was varied, a new time for delivery was selected and the transaction amounted to a waiver and satisfaction of all claims by the plaintiff, up to that time, for damages for delay in shipment theretofore."

Mr. Justice White, afterwards Chief Justice, said, in International Contracting Co. v. Lamont, with respect to a party, who had entered into a subsequent contract covering the same subject-matter, except as to the price per cubic yards, which was less than in the original undertaking: "He cannot avoid the legal consequences of his acts by protesting at the time he does them that he does not intend to subject himself to such consequences." In the case sub judico there was no protest.

In McCabe Construction Co. v. Utah Construction Co., it was held that the party to the contract, upon entering into a new contract covering the same subject-matter, fully performed by both parties, cannot maintain an action for breach of the first contract, which was necessarily superseded. The court said on page 978 of 199 Fed.: "Here the plaintiff had its election, upon the breach of the original contract by the defendant, to either stand on the contract and hold the defendant responsible for damages for such breach, or to accept the defendant's demand that it enter into another contract covering the same work at different prices and under different classifications 'as a substitute and in place of the original.' It chose the latter. It entered into the second contract of its own accord, although unwillingly. It performed the work thereunder, and has received the compensation stipulated therein. The fact that it protested against executing the second contract, or did not expressly assent to the change by way of substitution, does not affect its position for the better. It did, in fact, execute the contract voluntarily, and not through fraud or duress. If it had desired to rely on the first contract, it should have refrained from acceding to defendant's demand and entering into the second contract."

[3] By virtue of the new contract all the rights of the parties with respect to the original undertaking were determined. The Empire elected to reserve its right to delivery. It elected to pay compensation for the delays instant to its inability to then take the merchandise. It cannot now be heard to say, notwithstanding the terms of the new contract. that it will hold the spinning company for breach of the original undertaking.

[4] There was not only consideration for the new contract but the parties placed their agreement outside the prohibition of the statute of fraud. The defendant accepted goods under the modified contracts, paid carrying charges, and paid for the goods so accepted by the notes dated December 1, 1920. Any one of these acts is a sufficient execution to make the contracts, as modified by the verbal contract, good within the statute of frauds.

"Thus in a contract for the sale of goods if there has been part payment or acceptance and actual receipt of part of the goods after an oral variation of a written agreement, the whole agreement in its varied form is enforce-

able. * * * So if there has been part payment. In Dawson v. Yates, 1 Beav. 361, payment for an extension of time orally agreed upon as a variation of written contract for the sale of land was held to preclude forfeiture according to the terms of the writing." Williston on Contracts, § 593, note 21.

See In re Turpin Hotel Co. (C. C. A. Ninth Circuit–1918) 248 Fed. 25, 160 C. C. A. 165.

[5] However, if the correspondence referred to does not constitute a new contract, there was an express waiver of any right to damages for the antecedent delay. Williston on Contracts, § 704. The correspondence shows that in October and November the Empire requested the spinning company to withhold further shipments of fabric until advised as to the time to resume. This circumstance and the giving of notes and the payment of carrying charges was an express waiver of any rights predicated upon delayed deliveries. Had the Empire intended to keep alive a claim for damages, it should have asserted that right at the time it was giving notes and paying the carrying charges for the deferred deliveries—deferred not in the first instant, but in the second instant at its request.

The master allowed the spinning company damages because the Empire did not take delivery and allowed the Empire damages because the spinning company failed to make deliveries on time. The result is anomalous. The spinning company alone should have been allowed damages.

[6, 7] Another question arises as to the proper measure of damages. As to such fabric as the spinning company had made and not delivered, because requested not to do so, it is entitled to the difference between the contract price and the market price at the time of breach. As to a large amount of the fabric contracted for, the spinning company had not manufactured it at date of breach. It had large quantities of raw material to be used in the manufacture and was in a position to perform when requested. As to this branch of the case, the spinning company would be entitled to the profit it would have obtained had it performed. The spinning company could not manufacture the goods after breach, in order to secure the market value of the fabric as a basis for the determination of its loss, but it is entitled to the profit it would have made if it had completed the contract and the loss it suffered on raw materials by not doing so. It is entitled to its profits and the difference between the cost of raw materials and the market value on the day of breach. Both of these elements are included in the measure of damages applicable to completed goods, because the market value of completed goods reflect the drop in market value of raw materials. So in determining the loss where raw materials are on hand, but the product is not completed, the elements are a loss of profit on completing the contract with the raw materials on hand and the loss sustained by reason of the sale of those raw materials. See Williston on Sales, § 589; Williston on Contracts, 1380; Hinckley v. Pittsburg, etc., 121 U. S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967; Kingman & Co. v. Western Mfg. Co., 92 Fed. 486, 34 C. C. A. 489.

The third and fourth rules as laid down by Judge Sanborn in the Kingman Case, supra, are as follows:

"3. Where materials have been purchased and labor has been bestowed upon such articles under such a contract before the manufacturer has notice of the breach, his damages on these articles are the difference between the amount it would cost him to make and deliver them and their contract price, if greater, plus the differences between the value of the partly manufactured articles and the cost of the labor and materials that had been bestowed upon them at the time of the breach, if the cost be greater than the value.

"4. If materials have been purchased with which to fulfill the contract, but no work has been bestowed upon them at the time of the breach, the measure of the manufacturer's damages upon the articles which might have been made with such materials under the contract is the difference between the amount it would cost him to make and deliver them, including the cost of the materials, and their contract price, if greater, plus the difference between the cost and the market value of the materials that have been purchased at the time of the breach, if the market value be less than the cost."

The case of Grace v. Nagle (C. C. A.) 275 Fed. 343, is inapplicable. River Spinning Co. v. Atlantic Mills (C. C.) 155 Fed. 471, and Roehm v. Horst (3d Circuit) 91 Fed. 345, 33 C. C. A. 550, affirmed 178 U. S. 1, 20 Sup. Ct. 780, 44 L. Ed. 953, support the above proposition as well as the Uniform Sales of Goods Act New Jersey, § 64, subd. 4 (4 Comp. St. 1910, p. 4662) which is as follows:

"Action for damages for Nonacceptance * * * Measure of Damages * * * Labor or Expense by Seller after Repudiation; Loss of Profits.— (4) If, while labor or expense of material amount are necessary on the part of the seller to enable him to fulfill his obligations under the contract to sell or the sale, the buyer repudiates the contract or the sale, or notifies the seller to proceed no further therewith, *the buyer shall be liable to the seller for no greater damages than the seller would have suffered if he did nothing towards carrying out the contract or the sale after receiving notice of the buyer's repudiation or countermand.* The profit the seller would have made if the contract or the sale had been fully performed shall be considered in estimating such damages." (The italics are mine.)

Clearly this section contemplates a twofold element of damages: (1) The loss on the raw materials; and (2) the profit had the contract been fully performed. Both of these elements are forseeable consequences of breach. Both are reflected in the damages where a manufactured article is refused, and both should be reflected where the seller has on hand raw materials to be used in the manufacture of fabric which the buyer elected not to take.

Of the proofs taken, it is apparent that the spinning company's damages for breach of contract amounted to the sum of $145,852. This sum, in addition to the amount allowed by the master on the note account and on the carrying charge account, will be allowed. Subject to the modifications herein indicated, the master's report will be affirmed.

The opinion of Bodine, District Judge, in the court below as to the claim of Brighton Mills was as follows:

[8] The issues involved in this case are substantially the same as those involved in the claim of the Jenckes Spinning Company (memorandum filed herewith). The Brighton Mills (called Brighton) was the manufacturer of fabrics used in the manufacture of tires made by the Empire Tire & Rubber Corporation (called Empire). Contracts were made between the parties calling for the delivery of substantial amounts of material by the month. During the early part of the life of the contracts, Brighton delayed deliveries and the Empire urged performance. During the balance of the time, Empire requested delays and agreed to pay the carrying charges by reason of deferred deliveries. Receivers were appointed, who refused to carry on the contracts. The master properly found that the action of the receivers amounted to a breach of the contract and the Brighton Mills were entitled to damages by reason thereof.

[9] The action of the Empire in requesting delays of deliveries, which were all due, and agreeing to pay the carrying charges incident to the deferred deliveries, amount either to a new contract, the terms of which were substituted for the original undertaking adequately supported by consideration and outside of the statute of frauds, or to a waiver by the Empire of its rights under the original contract to deliveries of specific amounts on specific dates. In either event, Brighton is entitled to damages by reason either of Empire's breach of the contract, as modified by the new contract, or by reason of waiver of the terms of the original contract.

[10] Brighton had on hand at the time of breach, a quantity of raw material to be manufactured into the fabric contracted for. As to such goods to be manufactured, its damages cannot be measured as in case of goods on hand and ready for delivery. It is entitled to the difference between the contract prices of the fabric and the amount it would cost to manufacture and deliver, plus the difference between the cost and the market value of the materials for the manufacture of the article purchased at the time of the breach, if such market value be less than the cost. See section 64, subd. 4 of the Sales Act of New Jersey (4 Compiled Stat. p. 4662); Hinckley v. Pitts-

burgh Steel Co., 121 U. S. 264, 7 Sup. Ct. 875, 30 L. Ed. 967; Kingman & Co. v. Western Mfg. Co., 92 Fed. 486, 34 C. C. A. 489; In re claim Jenckes Spinning Co., the cause decided herewith.

Let a decree enter accordingly.

Robert B. Honeyman, of New York City, for appellant.

Herbert J. Lyall, of New York City, for appellee Brighton Mills.

Robert T. Swaine, of New York City, for appellee Jenckes Spinning Co.

Scott Scammell, of New York City, for creditors' committee.

Before WOOLLEY and DAVIS, Circuit Judges, and THOMSON, District Judge.

PER CURIAM. After reading the records in these cases and carefully considering the questions discussed in the accompanying briefs, we find ourselves everywhere in accord with the reasoning and conclusions of the learned trial judge. Important as are the questions raised and large as are the sums at stake, a recital of the extended correspondence between the parties on which the cases mainly turn and a discussion of the questions of law growing out of it would, we think, involve merely a repetition of the reasoning of the learned trial judge, and would add nothing to the decisions. We shall therefore affirm the judgments on his opinions.